IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ROBERT DUSCH, et al.,          )
                               )
          Plaintiffs,          )
                               )
     v.                        )  Civil Action No. 08-1021
                               )
HOUSING AUTHORITY OF PITTSBURGH, )
                               )
          Defendant.           )


MEMORANDUM and ORDER

Gary L. Lancaster,
Chief Judge.                              February 25, 2010

          This is an action in employment discrimination under
Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2 and the
Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 952 et seq.[1]
Plaintiffs, Robert Dusch, Jon Kaschauer, and Joseph Surmacy, all
Caucasian, allege that defendant, the Housing Authority of
Pittsburgh, discriminated against them on the basis of their race
and sex by firing them and then hiring less qualified females
and/or African Americans. Plaintiffs seek statutory and
compensatory relief and attorneys' fees. [Doc. No. 1].

          Defendant, the Housing Authority of Pittsburgh
("Authority"), has filed a motion for summary judgment under
Federal Rule of Civil Procedure 56(c), arguing that there is no
genuine issue as to any material fact and that it is entitled to

---

[1]Plaintiffs have abandoned their claim of age discrimination
under the Age Discrimination in Employment Act, 29 U.S.C. § 621.
[See Doc. No. 34].

judgment as a matter of law. [Doc. No. 26]. Defendant further contends there were legitimate, non-discriminatory reasons for the employment decisions regarding plaintiffs.

For the reasons that follow, defendants' motion will be granted.

## I.   FACTUAL BACKGROUND

Unless otherwise indicated, the following material facts are undisputed. We construe all disputed facts in the light most favorable to plaintiff, the non-moving party.

Plaintiffs, all Caucasian males, began working for the Authority in the 1980s. By 2004, plaintiffs were each employed as Field Maintenance Supervisors, responsible for supervising maintenance crews and coordinating maintenance work for the communities to which they were assigned.

Defendant, Housing Authority of the City of Pittsburgh, is a municipal corporation, formed under the United States Housing Act of 1937 and charged with providing affordable housing for low-income persons in the City of Pittsburgh.

In 2004, the Authority began to reorganize from centralized management to site-based management, in accordance with regulations from the U.S. Department of Housing and Urban Development ("HUD"). Under this new structure, each Authority community operates with its own management team and workforce. As

a result of the reorganization, four new positions were created:
Regional Asset Manager, Regional Facilities Specialist, Site
Manager, and Assistant Site Manager. Under the new organization,
the Authority's properties would be managed by three Regional Asset
Managers, and individual communities would be managed by Site
Managers, tasked with identifying and handling the needs of
residents in their assigned communities. Site Managers, with the
help of Assistant Site Managers, were responsible for developing
the budget for the property, managing that property within the
budget, site re-certification, and coordinating maintenance
activities and work orders.

Plaintiffs' supervisors encouraged them to apply for the
positions of Regional Facilities Specialist, Site Manager and
Assistant Site Manager positions. Ultimately, plaintiffs were
selected for the Regional Facility Specialist. As Regional
Facility Specialists, plaintiffs trained and advised Site Managers
on facility maintenance, modernization and development. Plaintiffs
understood that the positions were created specifically for them,
and that they were more prestigious and better paying positions.
However, another employee, who recommended plaintiffs for the
position, warned them that the Authority was planning to get rid of
plaintiffs after they trained their replacements.

In August 2006, A. Fulton Meachem, an African American
male, became executive director of the Authority after the

3

resignation of the previous director, Keith Kinard. In December 2006, Meachem hired Caster Binion, an African American male, as Chief Operating Officer of the Authority. In January 2007, Meachem hired Ed Mauk, a Caucasian male, as Chief Financial Officer.

In late 2006, it became clear that HUD, which typically funds around 84% of the Authority's operating budget, would significantly reduce the Authority's funding. As a result, the Authority contracted with TAG Associates, a public housing and site-based management consulting firm, to achieve a balanced budget, via reductions in force if necessary, while at the same time improving efficiency. TAG provided a report and recommendation, identifying, by department, positions to eliminate.

An executive team composed of Meachem, Binion, Mauk and Darlene Linder, the Authority's Human Resources Manager, reviewed TAG's report, which recommended the Regional Facilities Specialist positions occupied by plaintiffs were redundant and should be eliminated. TAG recommended eliminating other positions as well. The Authority implemented all of TAG's recommendations, resulting in the elimination of 103 employees over the course of 2007 and 2008. Of the 103 employees laid off, 67 were African American and 30 were female. Around the same time, the Authority also eliminated its internal police department and contracted the work out to the City of Pittsburgh Police, resulting in the loss of an additional 54 jobs.

4

Kaschauer and Surmacy's last day of work was May 25, 2007, Dusch's last day was May 29, 2007. As part of the layoff, plaintiffs were paid through June 22, 2007, and they retained their benefits until June 30, 2007. At the time of their layoffs, plaintiffs were earning approximately $55,000 a year.

According to the Authority's employee handbook, the Authority internally posts vacant available positions for a period of five workdays. To be considered for a position vacancy, employees must submit a written request to the Human Resources Department.

After their termination, the Authority mailed plaintiffs letters advising them of the availability of two assistant site manager positions with a salary range of $33,000 to $42,000. Fifteen people, including some laid off at the same time as plaintiffs, applied for those positions. Plaintiffs, however, did not apply for those positions, or any other jobs with the Authority. Instead, Kaschauer found a new job as an operating engineer at the University of Pittsburgh Medical Center's Presbyterian Hospital, Dusch opened his own business as an electrical contractor, and Surmacy took a job as an engineer at the Allegheny County Public Works Department.

Plaintiffs filed this lawsuit after receiving a right to sue letter from the Equal Employment Opportunity Commission. Following discovery, the Authority filed this motion for summary

judgment.

II.  Standard of Review

The court will grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" only if it might affect the outcome of the case under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Factual disputes concerning issues that are irrelevant to the outcome of the case are, therefore, not considered. Id. Factual disputes must also be "genuine" in that the evidence presented must be such "that a reasonable jury could return a verdict for the nonmoving party." Id.

A non-moving party may not successfully oppose a summary judgment motion by resting upon mere allegations or denials contained in the pleadings, or by simply reiterating those allegations or denials in an affidavit. Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888 (1990). Rather, the non-moving party must offer specific evidence found in the record that contradicts the evidence presented by the movant and indicates that there remain relevant factual disputes that must be resolved at trial. See id. If the non-moving party does not respond in this manner, the court,

when appropriate, shall grant summary judgment.    Fed. R. Civ. P. 56(e).

Because plaintiffs bear the burden of persuasion in Title VII actions, a defendant is entitled to summary judgment if it can demonstrate that plaintiff could not carry the burden of proof at trial.  Jalil v. Avdel Corp., 873 F.2d 701, 707 (3d Cir. 1989). Defendant may demonstrate this in two ways: it may show that plaintiffs are unable to establish a prima facie case of discrimination; or, if plaintiffs have successfully established a prima facie case, defendant may show that plaintiffs could not produce sufficient evidence of pretext to rebut an assertion of nondiscriminatory reasons for the discharge.  Id.  Summary judgment is inappropriate, however, if plaintiffs establish a prima facie case or counters defendant's proffered explanation with evidence raising a factual issue regarding the employer's true motivation for discharge.  When defendant's intent has been called into question, the matter is within the sole province of the fact finder.  Id.

With these concepts in mind, the court turns to the merits of defendant's motion.

III. Discussion

Plaintiffs allege that the Authority violated Title VII and the PHRA by firing them and hiring less qualified female and

7

African American workers.[2]   Title VII of the Civil Rights Act of
1964 and the PHRA make it unlawful for an employer to "discriminate
against any individual with respect to his compensation, terms,
conditions or privileges of employment because of such individual's
race, color, religion, sex or national origin." 42 U.S.C. §
2000e-2(a)(1). Title VII "prohibits both intentional discrimination
(known as 'disparate treatment') as well as, in some cases,
practices that are not intended to discriminate but in fact have a
disproportionately adverse effect on minorities (known as
'disparate impact')."   Ricci v. DeStefano, 129 S.Ct. 2658, 2672
(2009).

        A Title VII claim can be proven through circumstantial
evidence of discrimination under a burden shifting theory of
liability established by McDonnell Douglas Corp. v. Green, 411 U.S.
792 (1973). Under McDonnell Douglas, a plaintiff must first make
a prima facie case that he or she 1) is a member of a protected
class; 2) was qualified for the position; and 3) suffered an
adverse employment action under circumstances that give rise to an
inference of unlawful discrimination. Jones v. School District of
Philadelphia, 198 F.3d 403, 410-11 (3d Cir. 1999). However, the
United States Court of Appeals for the Third Circuit has held that

---
[2]

Because the analysis required for adjudicating Title VII and PHRA
claims are identical, the court will consider those claims
together.   See Goosby v. Johnson & Johnson Medical, Inc., 228
F.3d 313, 317, n.3 (2000).

8

a plaintiff who brings a "reverse discrimination" suit under Title VII, such as the one here, may establish a prima facie case of discrimination "by presenting sufficient evidence to allow a reasonable fact finder to conclude (given the totality of the circumstances) that the defendant treated plaintiff 'less favorably than others because of [their] race, color, religion, sex, or national origin.'" Iadimarco v. Runyon, 190 F.3d 151, 163 (3d Cir. 1999) (quoting Furnco Const. Corp. v. Waters, 438 U.S. 567, 577 (1978)).   Plaintiffs have the burden of demonstrating that similarly situated persons were treated differently.   Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 645 (3d Cir. 1998) (citing Texas Dept. Of Community Affairs v. Burdine, 450 U.S. 248, 258 (1981)).   The employer's actions "are considered in light of its actions towards the allegedly more favored group," in this case females and/or African Americans. Id.

        If plaintiffs establish a prima facie case, the burden of proof then shifts to the Authority to articulate a legitimate, nondiscriminatory reason for its employment action. McDonnell, 411 U.S. at 802.   If the employer answers its relatively light burden by articulating a legitimate reason for the unfavorable employment decision, then the burden of production "rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual (thus meeting the plaintiff's burden of persuasion)." Fuentes v. Perskie, 32 F.3d 759, 763 (3d

Cir. 1994); <u>see</u> <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530
U.S. 133, 143 (2000).

The Authority is entitled to summary judgment if there
remains no genuine issue of material fact at any level of this
framework. <u>Sherrod v. Philadelphia Gas Works</u>, 209 F. Supp. 2d 443,
449 (E.D. Pa. 2002). The ultimate burden of persuading the trier
of fact that the defendant intentionally discriminated against the
plaintiff remains at all times with plaintiffs. <u>Burdine</u>, 450 U.S.
at 253.


A. Prima Facie Case

Under <u>McDonnell Douglas</u>, plaintiffs must normally show
that they applied for the position that they were denied in order
to state a <u>prima facie</u> case of discrimination. <u>See</u> <u>EEOC v. Metal</u>
<u>Service Co.</u>, 892 F.2d 341, 347 (3d Cir. 1990). Nevertheless, the
failure to formally apply for a job opening is not fatal to a claim
of discriminatory hiring, "as long as the plaintiff made every
reasonable attempt to convey his interest in the job to the
employer." <u>Id</u>. at 348 (citing <u>Int'l Brotherhood of Teamsters v.</u>
<u>United States</u>, 431 U.S. 324, 365 (1977) ("A consistently enforced
discriminatory policy can surely deter job applications from those
who are aware of it and are unwilling to subject themselves to the
humiliation of explicit and certain rejection"). In the absence of
a formal application, plaintiffs must show that they "did

10

everything reasonably possible" to make their interest in the position known to defendants, that they "would have applied but for" defendant's discriminatory practices, or that they had a "real and genuine interest" in the position "but reasonably believed that a formal application would be futile." Newark Branch, NAACP v. Town of Harrison, 907 F.2d 1408, 1415 (3d Cir. 1990). As noted, to establish a prima facie case, the burden of proof falls on plaintiffs to produce some evidence that they were discriminated against on the basis of their race or sex.

### 1. Job availability

Plaintiffs argue that despite their experience and qualifications, they were not interviewed for, or informed of, openings at the Authority that existed at the time of their termination and shortly thereafter. However, the court notes that at no point do plaintiffs allege, or even offer proof, that the Authority failed to inform them of job availability because of their sex and race. In fact, the record supports the converse position. On May 30, 2007, the Authority mailed plaintiffs a letter stating that it had contracted with Lee Hecht Harrison, an outplacement agency, to help them locate a new job. The letter instructed plaintiffs to contact Alicia Johnson by June 15, 2007, to enroll in the program. None of the plaintiffs took advantage of this service, as evidenced by plaintiff Dusch's deposition

11

testimony:

> Q. Did you ever seek any outplacement assistance?
>
> A. I made a phone call to this Lee Hecht . . . I was in contact with them for, I would say, about three weeks after my termination.
>
> Q. So you called them, but you didn't hear back from them for three weeks?
>
> A. Oh no. No. No. We talked a few times, yes.
>
> Q. Did they provide you with any assistance?
>
> A. No, because I never pursued it.
>
> Q. Why didn't you pursue it?
>
> A. After having some conversations with my wife, I decided to start my own business.
>
> * * *
>
> Q. After you were laid off did you check to see if any jobs were becoming available at the Housing Authority?
>
> A. No, I did not.

[Doc. No. 35 at Ex. B, pp. 56-57, 59].

Plaintiff Kaschauer admitted that he received a posting in the mail from the Human Resources department concerning an assistant site manager opening.  However, he too did not apply for that position:

> Q. Did you talk to anybody at the Housing Authority after you received that posting?
>
> A. I did not.
>
> Q. Why not?

12

> A. I didn't want to argue with people. I
> didn't want to confront and get into an
> argument where - I just didn't.

[Doc. No. 35 at Ex. A, p. 78]. Surmacy also acknowledged knowing
about job postings through the Authority's website, but he too
failed to apply for those positions. As a result, plaintiffs
clearly did not make "every reasonable attempt to convey (their)
interest in the job to the employer." Metal Service Co., 892 F.2d
at 347.

Plaintiffs argue they did not apply for the open
positions because the Authority has a policy whereby an employee
must be rehired within fifteen days of termination so as to retain
the benefits and seniority he had accumulated over the years.
Plaintiffs did not apply for available positions because they did
not receive notification from the Authority until after the
fifteen-day period, and therefore, would have lost all the benefits
they had accumulated. As a result, according to plaintiffs "[i]t
was clearly futile to make such application after the 15-day period
had passed." [Doc. No. 34 at p. 8].

However, a review of the employee handbook reveals no
mention of such a rehiring policy, and plaintiffs produce no
evidence that such a policy actually exists, other than their own
deposition testimony:

> Q. Why did you not apply?
> Surmacy: At that point, I would have had to

13

start over.

Q. What do you mean?

A. Vacation, sick time. I would have had to -
if I wanted to move out of the city, I would
not be allowed.

\*\*\*

Q. Why did you determine that you would have
to start over?

A. Because I was told, and I'm not exactly
sure . . . who told me, after 10 or 11 days or
15 days, we would be considered terminated
employees of the City of Pittsburgh Housing
Authority and we would have to reapply.

[Doc. No. 35 at Ex. C, pp. 125-26].  Dusch and Kaschauer offered

similar testimony. [Doc. No. 35 at Ex. B, pg. 55 & Doc. No. 35 at

Ex. A, p. 61].

As evidenced by the above testimony, plaintiffs do not

establish that it would have been futile for them to reapply for

jobs available at the Authority, only that they would not have had

the same benefits they enjoyed as regional facility specialists.

See Newark Branch, NAACP, 907 F.2d at 1415.  As a result,

plaintiffs failed to establish that a fifteen-day policy would have

prevented them from securing new jobs with the Authority had they

chosen to apply.[3]

---

[3]

Furthermore, plaintiffs Kaschauer and Dusch testified that they
did not apply for new positions with the Authority because they
had moved outside city limits, and no longer met the city
residency requirement for employment with the Authority.

14

## 2. Failure to hire despite superior qualifications

Plaintiffs next argue that the positions for which they were qualified were filled by "less qualified individuals who were female and/or African American." In their depositions, plaintiffs name numerous individuals, both African American and Caucasian, male and female, who held positions for which they believe they were more qualified. Fundamentally, as already discussed, plaintiffs' argument fails because at no point did they ever apply for those positions. However, plaintiffs also provide no evidence that they were, in fact, better qualified for those positions than the females and African Americans who the Authority employed. For example, when asked at his deposition why he should have been given a job occupied by Sauntee Turner, an African American female site manager, plaintiff Dusch responded that he was much more highly qualified:

> Q. Why would you list her?
>
> A. Because my qualifications as a Manager are much higher than hers.
>
> Q. When she became a manager, was that position posted?
>
> A. Yes.
>
> Q. Did you apply for that position?
>
> A. No, I did not.
>
> Q. Approximately when did she became a manager?
>
> A. Between 2007 and the end of 2006. Somewhere

15

in there.

Q. So you are saying that when you were laid off, instead of being laid off, you should have received the manager's position that Ms. Turner held?

A. I could have received any of those manager positions on there or assistant managers, any of them, over this whole list of people that we have there because of my qualifications, what I have done for the Housing Authority in my 18 years.

[Doc. No. 35 at Ex. B, pp. 56-57, 59].

Plaintiffs own testimony, however, does not establish how they were more qualified than the females and/or African Americans employed by the Authority. For example, Dusch admitted that Harriet Waller, an African American female site manager at Garfield Heights, was "an excellent manager." Despite this, Dusch still argued, without providing any supporting evidence, discrimination occurred because his "qualifications as a Maintenance Supervisor, which I trained her in, are much higher than hers." [Doc. No. 35 at Ex. B, p. 90]. With respect to Marsha Winston, another black female site manager, Dusch stated that his qualifications were much higher than hers, but when asked about her background, he admitted, "I have no idea." [Doc. No. 35 at Ex. B, pp. 56-57, 59].

Gretchen Recktenwald, Dusch's direct supervisor, testified that Dusch "did not have any overall management experience of managing all the aspects of a site" and would not necessarily have been hired as a site or assistant site manager.

16

[Doc. No. 35 at Ex. D, p. 32]. As noted, site managers, with the help of assistant site managers, were responsible for developing the budget for the property, managing that property within the budget, site re-certification, and coordinating maintenance activities and work orders. The record clearly shows that despite their years of experience and expertise in maintenance, plaintiffs were not more qualified for the positions of site manager and assistant site manager because those positions required experience handling administrative and budgetary matters that plaintiffs did not establish that they possessed.

In sum, plaintiffs do not demonstrate that they were qualified for those positions, other than their own opinion.

3. Demotions Without Pay

Finally, as evidence of discriminatory intent on the part of the Authority, plaintiffs claim that African Americans and females were treated more favorably because they were demoted without a corresponding reduction in pay. In support of their claim, plaintiffs point to Curtis Hefflin, an African American male, who was demoted from site management supervisor to an assistant manager. However, the Authority provided his pay tables showing that Mr. Hefflin did, in fact, receive a more than $4,000 reduction in his pay. [See Decl. of Alicia Johnson, Doc. No. 28 at Ex. K, part 3, p. 10].

17

Plaintiffs also testified that the Authority specifically created a job for Joy Pekar, an African American female who was formerly the head of the Authority's police department. They contend she was given a job as liaison to the Pittsburgh Police after the Authority eliminated its police department. However, the Authority did not post the position and no one else had the opportunity to apply for this job. Plaintiffs do not contend that they were qualified for or that they should have been interviewed for this position; however, they point to it as evidence that the Authority favored African American and/or female employees.

The court finds plaintiffs' reliance on Ms. Pekar to be misplaced because they cannot selectively choose a comparator. Simpson, 142 F.3d at 645. The record shows that the Authority discharged numerous individuals, both male and female, African American and Caucasian. Plaintiffs would have the court ignore those instances and focus on this one example of alleged favoritism of creating a position for an African American woman.[4]   See id. (quoting Bush v. Commonwealth Edison Co., 990 F.2d 928, 931 (7th Cir. 1993)("Such a pattern, in which blacks sometimes do better than whites and sometimes do worse, being random with respect to race, is not evidence of racial discrimination")).   Furthermore, the Authority presented evidence that after eliminating its own

---

[4]

The court also finds plaintiffs' argument undermined by the fact that they testified the Authority created the Regional Facilities Specialist positions specifically for them.

18

police force, it needed a liaison between itself and the Pittsburgh Police. As former head of the Authority's police department, Pekar was uniquely qualified for the role. Had Pekar turned the job down, there is no evidence that the position would not have been posted and the job given to another African American and/or female rather than plaintiffs.

As a result, plaintiffs do not establish a prima facie case of discrimination because there is no evidence that the Authority treated plaintiffs differently on the basis of their race or sex. Plaintiffs' bald assertions that they were treated differently and terminated on account of race and gender are insufficient to survive summary judgment. See Hicks v. Arthur, 878 F. Supp. 737, 740 (E.D. Pa. 1995) (granting summary judgment for defendants on plaintiff's disparate treatment claim were plaintiff merely relied on allegations in her deposition and failed to present any evidence as to disparate treatment).[5]

---

[5]

The court also rejects plaintiffs' argument that a culture of discrimination exists at the Authority. Plaintiffs' sole evidence of such a culture is a newspaper article with a quote from Stanley Lowe, a former executive director of the Authority, who stated "I will not have an all-white Housing Authority." Plaintiffs present no evidence as: 1) when that statement was made, 2) whether Mr. Lowe was involved in employment decisions, and 3) that such a statement had any bearing on the firing decision made by the Authority's executive team at the time of their firing, of which Mr. Lowe was not a member a member.

19

B. <u>Pretext</u>

          Even if the court agreed that plaintiffs had made out a
<u>prima</u> <u>facie</u> case of discrimination on the basis of their sex and
race, the Authority has offered a legitimate, non-discriminatory
explanation.   According to the Authority, in 2006, HUD, which
provides upwards of 84% of the Authority's funding, drastically
reduced their funding.  As a result, the Authority brought in TAG,
an outside consultant, to identify areas where cuts could be made.
The Authority instructed TAG to not consider employee performance,
salary, or experience in making its recommendations.   TAG
determined that plaintiffs' positions were redundant, and
recommended that they be eliminated.  An executive team from the
Authority accepted TAG's recommendations. Between 2006 and 2007,
the Authority terminated 103 employees, including plaintiffs, of
which 67 were African Americans, and 30 were females.

          Plaintiffs fail to provide any evidence that the
Authority's proffered reason for their firing is pretextual.   In
fact, they admit on several occasions in their depositions that
budgetary reasons played a role in their dismissal.  For example,
when asked why he believed he was laid off, plaintiff Kaschauer
responded "because I was a tenured employee there who had maximum
amount of sick time, maximum amount of vacation time, and I became
an expensive employee, and that instead of keeping me, it was
cheaper to let me move on." [Doc. No. 35 at Ex. A, Pg. 117].

Plaintiffs do not at any point contest that HUD had significantly reduced the Authority's funding. Plaintiffs instead merely allege without evidence that they were indispensable employees who were forced into accepting dead end jobs, and then ultimately fired and replaced by lesser qualified women and/or African Americans. However, they fail to rebut the Authority's legitimate, non-discriminatory argument that a reduction in force was necessary for budgetary purposes, that their positions were redundant, and that 103 employees were laid off, including African Americans and females. The record simply does not support planitiffs' contention that the consultant's report was a pretext for discriminating against them on the basis of their race or sex. As a result, summary judgment is appropriate.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ROBERT DUSCH, et al.,          )
                               )
          Plaintiffs,          )
                               )
     v.                        )    Civil Action No. 08-1021
                               )
HOUSING AUTHORITY OF PITTSBURGH,    )
                               )
          Defendant.           )

ORDER

AND NOW, this 25 day of February, 2010, it is hereby

ORDERED, ADJUDGED and DECREED that defendant's motion for summary

judgment [Doc. No. 26] is GRANTED.  The Clerk of Court is directed

to mark this matter CLOSED.

BY THE COURT:

_____, C. J.

cc:  All Counsel of Record